## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ANDREW ROGERS, | CIVIL ACTION NO. 2:21-cv-1762 |
| *Plaintiff* | |
| | JUDGE WENDY B. VITTER |
| v. | |
| | MAG. JUDGE DANA M. DOUGLAS |
| PHILLIPS 66 COMPANY, PHILLIPS 66, and ANN JANSON, | |
| *Defendants* | JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### I.   INTRODUCTION

1.      Andrew Rogers is an experienced procurement and contract expert with almost two decades of experience in the petroleum industry. Unfortunately, in 2015, Mr. Rogers suffered a Traumatic Brain Injury (TBI) which resulted in the development of several lifelong disabilities impacting his cognitive abilities. Despite these challenges, however, he was able to continue succeeding at work with minor modifications to his work environment, including short breaks, reduced lighting, and temperature control. Although initially, Defendants were optimistic about Mr. Rogers future and success in a new position at the Alliance Refinery in Belle Chasse, Louisiana, and even said a quick promotion was likely, Defendants suddenly began to retaliate and discriminate against Mr. Rogers when they learned about his age and disabilities after his hire. All of his supervisors, and Human Resources Manager Ann Janson, refused to accommodate a single request to assist him to work with his disabilities. Even his FMLA requests were denied, despite the fact that he clearly qualified for that leave under Federal law. Further, Mr. Rogers was

repeatedly denied promotions, even though he was told that he was qualified for those promotions before he decided to accept a position with Phillips 66. Ultimately, Mr. Rogers was terminated, and now, he has suffered emotional damages, and lost wages and benefits as a result. Unfortunately, Mr. Rogers is not alone; he is one of almost two dozen individuals over the age of 40 who has been terminated by Ms. Janson in the last two years.

## II.    JURISDICTION AND VENUE

2.    This Court has jurisdiction over Mr. Rogers's federal claim pursuant to 28 U.S.C. § 1331 because they arise under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*., the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq*; the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*.; and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq*, all of which are federal statutes.

3.    This Court has supplemental jurisdiction over Mr. Rogers's state law causes of action pursuant to 28 U.S.C. § 1367.

4.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to Mr. Rogers's claims occurred at the Alliance Refinery, which is located in Plaquemines Parish, Louisiana, within the Eastern District of Louisiana, and at all times relevant to this Complaint was owned and/or operated by Defendants Phillips 66 Company and Phillips 66.

## III.    PARTIES

5.    Plaintiff **ANDREW ROGERS** is a 46-year-old individual who resides in Travis County, Texas. Mr. Rogers was formerly employed by Defendants at the Alliance Refinery (hereinafter "Alliance Refinery" or "Alliance") located in Belle Chasse, Plaquemines Parish, Louisiana, within the Eastern District of Louisiana.

2

6.     Defendant **PHILLIPS 66** is a Delaware corporation doing business in the State of Louisiana. Defendants Phillips 66 and its wholly-owned subsidiary, Phillips 66 Company, own and operate the Alliance Refinery. Phillips 66 employed more than 800 individuals at the Alliance Refinery, and more than 10,000 employees in total, at all times relevant to this Complaint. Phillips 66 is a recipient of federal financial assistance from the Department of Energy, including a $3 million grant awarded on September 27, 2020, and continuing through March 26, 2022.

7.     Defendant **PHILLIPS 66 COMPANY** is a Delaware corporation doing business in the State of Louisiana and a wholly-owned subsidiary of Defendant Phillips 66. At all times relevant to this Complaint, Defendant Phillips 66 Company managed, owned, and/or operated the Alliance Refinery, where it employed more than 800 individuals. Defendant Phillips 66 Company is also a recipient of Federal financial assistance as described above.

8.     Defendant **ANN JANSON** is an individual of the age of majority who was a supervisor employed by Phillips 66 and Phillips 66 Company at the Alliance Refinery at all times relevant to this Complaint. On information and belief, prior to September 1, 2021, and at all times relevant to this Complaint, Ms. Janson was domiciled in Orleans Parish in the State of Louisiana. On information and belief, Ms. Janson is now domiciled in Union County in the State of New Jersey.

### IV.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.     On January 15, 2020, Mr. Rogers timely filed an Equal Employment Opportunity Commission (EEOC) Charge of Discrimination alleging age discrimination, disability discrimination, and retaliation by Defendants.

10.     Mr. Rogers requested a Notice of Right to Sue on July 1, 2021, after more than 180 days had elapsed since the EEOC assumed jurisdiction over his Charge of Discrimination.

11.     On July 8, 2021, the EEOC issued a Notice of Right to Sue pursuant to Mr. Rogers's request.

12.     This action is being filed within 90 days of Mr. Rogers's receipt of the EEOC's Notice of Right to Sue.

13.     Mr. Rogers has fully complied with all prerequisites to jurisdiction in this Court under the ADEA and ADA.

## V.     FACTUAL BACKGROUND

### A.  Mr. Rogers is a Disabled Individual Who Was Eminently Qualified for His Position at Phillips 66.

14.     Mr. Rogers is a 47-year-old man with more than 15 years of industry experience in the North American energy sector. Before he was recruited by Phillips 66, Mr. Rogers obtained a Bachelor of Science from Nicholls State University in 1988. After receiving his degree, Mr. Rogers began his career at Transocean Deepwater managing procured equipment and tracking reports for procured equipment and inventory. Next, Mr. Rogers spent ten years working for Fluor Corporation, where he gained extensive experience in procurement, material management, and contracting experience at numerous refineries and other project sites, particularly along the Gulf Coast. While at Fluor, he served as a Buyer procuring equipment, and then as a Procurement and/or Material Manager from 2013 to 2017.

15.     In 2015, Mr. Rogers suffered from a traumatic brain injury (TBI) that caused him to develop numerous disabilities, including chronic tinnitus; seizures; frequent severe headaches; vertigo; attention and short-term memory deficits; visual impairments, including extreme sensitivity to light; and speech problems. Furthermore, Mr. Rogers was diagnosed with Post-Traumatic Stress Disorder (PTSD), anxiety, and depression as a result of the accident that caused his TBI.

4

16.     Mr. Rogers will continue to suffer from these disabilities for the rest of his life.

17.     Even with these disabilities, Mr. Rogers continued to succeed professionally while working at Fluor, and his strong work ethic and excellent performance reviews led to consistent pay increases and labor grade promotions.

18.     In October 2018, Mr. Rogers interviewed for a new position as Services Buyer Contract Agent at the Alliance Refinery. Shawn Sullivan, Procurement Lead, told Mr. Rogers that the Contract Agent position would entail issuing purchase orders for approximately six months before transitioning to a promotion to the position of Contract Specialist.

19.     Soon after, Mr. Rogers was offered the Services Buyer Contact Agent position. Mr. Rogers accepted the job offer, particularly looking forward to the job advancement opportunities described by Mr. Sullivan.

**B.      Mr. Rogers Notified Ann Janson and Mr. Sullivan of his Disabilities, but They Failed to Engage in the Interactive Process.**

20.     On January 2, 2019, Mr. Rogers began his new position at the Alliance Refinery. During his first day on the job, Mr. Rogers told Ann Janson, Human Resources Director, that he suffered from ongoing disabilities due to the TBI he sustained in 2015. However, when Mr. Rogers asked Ms. Janson if they could have a conversation about potential accommodations for his disabilities, she declined.

21.     Shortly after his onboarding, Mr. Rogers informed Mr. Sullivan that he suffered from disabilities that were exacerbated by certain workplace conditions, including fluorescent lighting, excessive heat, and prolonged "screen time" in front of a computer without a break.

22.     Mr. Rogers further informed Mr. Sullivan that these side effects could easily be mitigated with minor alterations to Mr. Rogers's work environment, such as short, periodic breaks

from his computer and alternate indoor lighting. However, Mr. Sullivan refused to engage in the interactive process or offer any accommodations to Mr. Rogers.

23.     On several subsequent occasions, Mr. Rogers and Mr. Sullivan had detailed conversations in which Mr. Rogers described the traumatic accident that caused his TBI, the extent of the debilitating physical and mental injuries that he sustained, and the multitude of doctors he had been required to see over the years.

24.     Mr. Rogers also made several simple requests to change or turn off the fluorescent lighting above his desk because of headaches. Despite this, Mr. Sullivan refused and did not offer a single accommodation or engage in the interactive process.

**C.     Mr. Sullivan Treated Mr. Rogers Far Less Favorably than his Younger and Non-Disabled Counterparts.**

25.     During the first six months of Mr. Rogers's employment at Alliance, Mr. Sullivan repeatedly commended his outstanding job performance, recognizing him in a mid-year performance review as a "key member of the Alliance Procurement Team" who had "made an immediate impact to [the] business."

26.     Despite commending Mr. Rogers's excellent performance in his new position, Mr. Sullivan, who was five years Mr. Rogers's junior, treated Mr. Rogers less favorably than the two Contract Specialists who served under him: Chad Boudreaux and Barbara Bryant. Neither Mr. Boudreaux nor Ms. Bryant was disabled, nor did they require the use of FMLA leave.

27.     Mr. Sullivan gave especially preferential treatment to Mr. Boudreaux, who – like Mr. Sullivan – was much younger than Mr. Rogers.

28.     For example, Mr. Boudreaux was always permitted to choose his vacation days first. Mr. Sullivan also excluded Ms. Bryant, a 68-year-old woman, and Mr. Rogers from meetings and only included Mr. Boudreaux.

6

29.     Further, Mr. Boudreaux was never disciplined, even though he repeatedly failing to properly perform his job duties. Mr. Boudreaux even awarded a contract worth over $2,000,000 to his former employer in blatant violation of Phillips 66's company policies, yet he suffered no adverse consequences whatsoever. Instead, of disciplining Mr. Boudreaux, Mr. Sullivan frequently instructed Mr. Rogers to fix Mr. Boudreaux's mistakes and assume the responsibility for many of Mr. Boudreaux's basic job duties.

**D.    Ann Janson Failed to Engage in the Interactive Process after Mr. Rogers's Requests for Accommodations and Refused to Respond to his Request for Medical Leave for his Disabilities.**

30.     In May 2019, Mr. Rogers sought additional medical treatment for his physical and mental disabilities. To undergo this treatment, Mr. Rogers had to take several days of medical leave.

31.     Phillips 66's FMLA Policy, which instructs employees to contact either "HR Connections . . . or their local HR representative if they have any questions[.]"

32.     Mr. Rogers asked Ms. Janson if he needed to go through Alliance's Human Resources Department to complete the process. Ms. Janson instructed him to "get with Skip [Stewart]," a nurse practitioner at Alliance, if he wished to request FMLA leave.

33.     Phillips 66 admitted in its Response to the EEOC Charge of Discrimination that "contact[ing] the on-site medical provider" regarding his "personal, medical information" was the correct procedure to follow.

34.     When Mr. Rogers went to Alliance's medical office to meet with Mr. Stewart, he was given a hard copy of the company's FMLA and accommodation forms and told to return them to the medical office when completed.

35.     On June 12, 2019, Mr. Rogers's neurologist recommended that he begin physical, speech, and audiological therapy, as well as mental health treatment for his diagnoses of PTSD, anxiety, and depression.

36.     As instructed by Mr. Stewart, Mr. Rogers submitted his FMLA forms and doctors' certifications to Alliance's medical office by leaving hard copies with Janice Munkres, an employee in the HR Department. After that, he never received a response to his request.

37.     Because the company refused to grant – or even review – his request for FMLA leave, Mr. Rogers had to take off two to four days of annual leave for medical treatment every month from May 2019 until his layoff in October 2020.

38.     He was never allowed to take any of this time as FMLA leave, despite his entitlement to the job-protected leave for his serious illnesses and disabilities.

39.     On July 8, 2019, Mr. Rogers submitted a request to Alliance's medical office from his Speech and Language Pathologist for FMLA leave, and accommodations for his sensory integration deficits and other psychological injuries related to his TBI, requiring a reduction in screen time, and noise and light exposure. The request asked for time for weekly speech therapy until August 2019 once per week and 15-minute breaks from his computer every several hours as needed. Once again, the company never responded. As a result, Mr. Rogers never received the needed breaks, or any reductions in his screen time, noise, or light exposure.

40.     In mid-July 2019, having heard nothing about either of his requests for FMLA leave and accommodations for his disabilities, Mr. Rogers followed up directly with Ms. Janson, who informed Mr. Rogers that she "didn't want to have anything to do with it." Ms. Janson again ordered Mr. Rogers to send all FMLA and disability accommodation requests directly to Mr. Stewart in Alliance's medical office.

41.     It was not until May 2020 – nearly one year later – that anyone responded to his requests. Mr. Stewart then told Mr. Rogers that Phillips 66 "had no record" of his FMLA paperwork or his accommodation requests.

**E.     Mr. Sullivan Continued to Target Mr. Rogers's Despite his Strong Performance.**

42.     On July 17, 2019, Mr. Sullivan gave Mr. Rogers a positive first performance review. Mr. Sullivan noted that Mr. Rogers was "extremely dedicated and [has the] drive to succeed," "holds himself to a very high standard," and "continues to improve and add value to our mission[.]" He also praised Mr. Rogers for his "willingness to engage in tough conversations."

43.     During his review, Mr. Rogers asked Mr. Sullivan if he could be considered for a promotion to the position of Contract Specialist, as the initial six-month period discussed during his interview was over.

44.     The Contract Specialist position required only five years of experience in procurement, strategic sourcing, and contracting processes. The position also required strong written, verbal, and interpersonal communication skills, and the ability to fully comply with all relevant policies, standards, and key procedures while simultaneously minimizing risk and cost exposure.

45.     Mr. Rogers was more than qualified for a Contract Specialist position at Alliance. In addition to his bachelor's degree, he had far more than five years of professional experience in procurement, sourcing, and contracting; strong written, verbal, and interpersonal skills, as recognized by his supervisors; and ample experience at Phillips 66 complying with all company policies, standards, and procedures.

46.     Despite his exemplary first performance review and qualifications for the role of Contract Specialist, Mr. Sullivan denied Mr. Rogers the promotion that had been discussed before he learned of Mr. Rogers's disabilities.

47.     Mr. Sullivan continued to show blatant favoritism towards Mr. Boudreaux, who was seven years younger than Mr. Rogers and did not have any disabilities.

48.     In September 2019, Ms. Bryant and Mr. Rogers met with Mr. Sullivan and Mr. Boudreaux to discuss their concerns that Mr. Boudreaux was being treated more favorably than them. Mr. Sullivan became visibly angry upon hearing their complaints. However, after Mr. Rogers stated that he and Ms. Bryant intended to submit their concerns to Phillips 66's corporate headquarters in Houston, Texas, Mr. Sullivan quickly changed his stance, assuring Mr. Rogers that that wouldn't be necessary. At the end of the meeting, Mr. Sullivan asked Mr. Rogers for reassurance that they were "all good."

**F.      Mr. Sullivan Retaliated Against Mr. Rogers by Giving Him a Poor Performance Review Criticizing Him for His Disabilities.**

49.     Later in September 2019, Mr. Sullivan announced that he would be leaving Alliance Refinery. This meant that there was an opening for his position as Procurement Lead.

50.     Despite his previous promises to promote Mr. Rogers, Mr. Sullivan advocated for Mr. Boudreaux to take over his role as Procurement Lead as Mr. Sullivan transitioned out of that position.

51.     Then, Mr. Sullivan gave Mr. Rogers a negative end-of-year performance review, knowing that this would prohibit him from applying for any promotions in the upcoming year under Phillips 66 company policy.

52.     The review was extremely critical, rating Mr. Rogers at just a 4 ("Below Expectations") and claiming that "when challenged or a tough situation arises, Andy has shown a

tendency to limit participation." Of course, this is directly contradicted by Mr. Sullivan's glowing review of Mr. Rogers's work performance just three months earlier.

53.     In its Position Statement submitted in response to the EEOC Charge filed by Mr. Rogers, Defendants repeatedly admitted that this poor performance review was based on how Mr. Rogers "handled stress related to his position." This demonstrated Defendants' willingness to penalize Mr. Rogers because of his disabilities, including PTSD and anxiety, which directly impacted his ability to handle stress.

54.     It was not until January 2020, when Mr. Rogers had his end-of-year review with Garth Flaming, the Interim Procurement Lead, that Mr. Rogers learned about the negative performance review. Mr. Rogers complained about the review to Mr. Flaming, but he refused to take any corrective action.

55.     Consequently, Mr. Rogers was required to sign a 2019 Performance Agreement that reflected the unwarranted negative performance rating, as well as Mr. Flaming's newly added criticism in the review that Mr. Rogers "has not been to the level of expectation for the role" and "need[s] to take on additional responsibilities[.]" Of course, Mr. Flaming had only worked with Mr. Rogers for two months and was influenced to criticize Mr. Rogers by Mr. Sullivan's discriminatory review. Mr. Sullivan and Mr. Flaming were aware that under Phillips 66 policy, Mr. Rogers could not receive a promotion based on this negative review.

**G.     Ms. Michaud Promoted Mr. Rogers's Younger, Non-Disabled Peers instead of Mr. Rogers.**

56.     On March 31, 2020, Mr. Flaming left Alliance Refinery, and the Procurement Lead position was posted.

57.     Mr. Rogers was well-qualified for the Procurement Lead position, as he had extensive professional experience leading Procurement activities, including sourcing, contracting, materials management, and P2P, both at Phillips 66 and at other companies in the industry.

58.     Before disclosing his disabilities, during his initial interview, Mr. Rogers had been told that he was qualified for, and could expect, a promotion within months. That promotion never occurred.

59.     Even after the Procurement Lead position was posted in March 2020, Suzanne Michaud, BU Lead for Procurement for Midstream and Refining, informed Mr. Rogers that he was unable to apply because of the negative performance review created by Mr. Sullivan and enforced by Mr. Flaming.

60.     Furthermore, Ms. Michaud also informed Ms. Bryant, who is 20 years older than Mr. Sullivan and Mr. Boudreaux, that she would not be allowed to apply for the position. The very next day, Mr. Boudreaux was given the Procurement Lead position.

61.     Similarly, younger employees in other departments were also promoted to Lead positions even without meeting the basic qualifications for the positions, including Chad Sanchez, Planning and Scheduling Lead, and Brent Boudreaux, Turnaround Lead. Both were promoted despite not even having bachelor's degrees.

**H.      Mr. Boudreaux Had Notice of Mr. Rogers's Disabilities.**

62.     While still co-workers, Mr. Rogers had several conversations with Mr. Boudreaux about his disabilities. Mr. Rogers had informed him of his brain injuries and the difficulties they caused for him when working under fluorescent lights, being overheated for extended periods of time, and excessive screen time which resulted in headaches and tinnitus.

63.     On one occasion, Mr. Boudreaux asked Mr. Rogers, in front of other co-workers, if he kept handwritten notes at his desk because he was "OCD." Mr. Rogers explained that he had

to keep written notes to remember things due to his disabilities, which included short-term memory impairment and attention deficits.

64.     However, even though Mr. Boudreaux knew about Mr. Rogers's disabilities, he refused to discuss any reasonable accommodations for Mr. Rogers's disabilities or engage in the interactive process after he was promoted to Procurement Lead, thus becoming Mr. Rogers's supervisor.

I.       **Mr. Michaud Selected Younger, Non-Disabled Individuals with Less Experience for Promotion over Mr. Rogers.**

65.     On April 28, 2020, Mr. Rogers learned there was a vacant Contract Specialist position created when Mr. Boudreaux took over the role of Procurement Lead.

66.     At the end of April 2020, Mr. Rogers asked Mr. Boudreaux to promote him to the vacant Contract Specialist position, and Mr. Boudreaux refused.

67.     Mr. Rogers continued to ask Mr. Boudreaux to promote him during their weekly one-on-one meetings in May 2020. Mr. Boudreaux did not respond other than to say that Ms. Michaud made final decisions.

68.     Finally, in June 2020 the Contract Specialist position was posted online, and Mr. Rogers formally applied.

69.     On June 18, 2020, Ms. Michaud informed Mr. Rogers that he would not even be interviewed for the position. When Mr. Rogers asked why he was being excluded from consideration, Ms. Michaud explained that her decision was based on negative feedback from Mr. Boudreaux.

70.     On July 27, 2020, Ms. Michaud hired John Davis, a non-disabled individual who, like Mr. Sullivan, is three years younger than Mr. Rogers, for the Contract Specialist position.

13

Unlike Mr. Rogers, Mr. Davis had no prior experience working for Phillips 66 at Alliance Refinery or any of Defendants' other facilities.

71.     Ironically, after Mr. Davis was hired as the new Contract Specialist, it was Mr. Rogers who had to train Mr. Davis for his new position, as Mr. Boudreaux lacked the basic knowledge to do so.

**J.     Mr. Boudreaux Harmed Mr. Rogers by Refusing to Accommodate his Disabilities.**

72.     On or around August 7, 2020, Mr. Boudreaux exacerbated Mr. Rogers's injuries by moving Mr. Rogers's office into a small, non-air-conditioned trailer, even though it was the hottest month of the year in southern Louisiana and the medical records in Mr. Rogers's file specifically ordered that he "must avoid excess heat." Further, Mr. Boudreaux was aware that the office he placed Mr. Rogers in was the hottest in the trailer. As a result of Mr. Boudreaux's conduct, Mr. Rogers was forced to leave work early on multiple occasions in August due to migraine headaches caused by being overheated.

**K.     Ms. Michaud Selected Younger, Non-Disabled Individuals with Less Experience for Promotion.**

73.     On August 24, 2020, Ms. Michaud hired yet another Contract Specialist. This time she hired Whitney Nolan Campbell, who is ten years younger than Mr. Rogers, was not disabled, and did not require the use of FMLA leave. Mr. Rogers was not even given the chance to apply.

74.     On September 21, 2020, an open Contract Specialist position at Alliance Refinery was still posted on Defendants' job listing website.

**L.     Defendants Terminated Mr. Rogers Based on His Age and Disabilities.**

75.     On October 7, 2020, Mr. Boudreaux abruptly terminated Mr. Rogers, claiming he was being "laid off" due to "recent business decisions." Mr. Boudreaux then asked security to

immediately escort Mr. Rogers from the refinery's premises. Mr. Rogers was offered a severance of four weeks, but only if he waived all claims against Phillips 66.

76.     Mr. Rogers was over 40 years old when offered this severance payment, and he was allegedly laid off as part of a class of others laid off. Therefore, he was entitled to the protections of the Older Worker Benefit Protection Act. Despite knowing this, Defendants attempted to cover up their discriminatory termination of individuals over 40 by failing to include a list of ages and job titles of other individuals affected by the layoff in Mr. Rogers's severance agreement, as required by the Older Worker Benefit Protection Act.

77.     Mr. Rogers was concerned he had been discriminated and retaliated against, and aware of the catastrophic financial impact of his termination, late in his career, and during a global pandemic, Mr. Rogers declined the severance offer.

78.     Other older workers were laid off from the Alliance facility around the same time by Ms. Janson, including Janice Munkres. Ms. Munkres was also asked to waive all claims in exchange for a severance payment. Her agreement also did not include a list of ages and job titles of other individuals affected by the layoff as required by the Older Worker Benefit Protection Act.

**M.     Ms. Janson terminated Mr. Rogers and Almost Two Dozen Other Employees from Alliance Refinery, Who Were Over 40 Years Old in Less than Two Years.**

79.     Mr. Rogers was just one of many dedicated Alliance Refinery employees who were targeted for termination based on their age. Between 2019 and 2021, Mr. Rogers and many other individuals over the age of 40 were abruptly terminated, laid off, forced to resign, or forced to retire from their positions at the Alliance Refinery, including Chris Pizzuto, Jack Serigne, Blair Stevens, Galen Roy, Jeff Winget, Brian Duncan, Peter Ernst, Keith Dials, Jeff Winget, David Binderwald, Emily Campbell, Mike Terrio, Brian Duncan, Cynthia Becnel, Lina Farrar, Janice Munkres, Blair Stevens, George Turlich, Galen Roy, William Bartholomew, and Darren Williams.

80.     Ann Janson made the decision to terminate Mr. Rogers and each of the individuals terminated at the Alliance Refinery, including the individuals identified above.

81.     In addition to Mr. Rogers, Ms. Janson also hyperscrutinized, disciplined, and terminated other individuals who exercised their rights under the FMLA and ADA including Mike Terrio who requested Family Medical Leave Act leave to accommodate his disabilities.

82.     Ms. Janson terminates employees without conducting an independent investigation and is influenced by employees' supervisors in determining whether to terminate employees.

83.     During her employment, Ms. Janson targeted older employees based on a bias against these employees based on their age, and in favor of younger employees.

84.     Further, Ms. Janson targeted approximately 10% of the workforce at Alliance Refinery for termination to provide cost savings to Defendants. Ms. Janson also targeted older and disabled workers to increase cost savings.

85.     Mr. Rogers was replaced by John T. Davis, who is younger than Mr. Rogers, is not disabled, and has never requested FMLA leave or accommodations.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.***
**Disparate Treatment**
*(Against Defendants Phillips 66 and Phillips 66 Company)*

86.     Mr. Rogers hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

87.     At all times pertinent to this Complaint, Defendants were employers within the meaning of the ADEA, as defined by 29 U.S.C. § 630, and employed twenty or more employees.

88.     At all times pertinent to this Complaint, Mr. Rogers has been over the age of forty years old and, accordingly, protected by the ADEA.

16

89.     Mr. Rogers was subjected to adverse employment actions when he was not promoted to open positions for which he was qualified and when his employment was terminated.

90.     Mr. Rogers was over 40 years old when he was subjected to all the adverse employment actions described herein.

91.     Mr. Rogers was qualified for his position at the Alliance Refinery, as well as the promotions to which he applied.

92.     Defendants would not have taken adverse employment actions against Mr. Rogers but for his age.

93.     Mr. Rogers's supervisors subjected him to adverse employment actions when they disciplined him and recommended his termination based on his age.

94.     Although Mr. Rogers was qualified for promotions, Defendants promoted non-disabled individuals in place of Mr. Rogers.

95.     Mr. Rogers's supervisors intended to cause Mr. Rogers to suffer an adverse employment action.

96.     Mr. Rogers's supervisors influenced the decisionmakers to cause the adverse employment actions taken against Mr. Rogers.

97.     The decisionmakers in Mr. Rogers's termination also terminated him based on his age.

98.     Defendants' reasons for terminating Mr. Rogers were not legitimate and were pretext for age discrimination.

99.     Mr. Rogers was replaced by someone younger than him and treated less favorably than similarly-situated younger employees.

100.     Mr. Rogers was subjected to severe and pervasive harassment by his supervisors.

101.     This harassment altered the terms and conditions of his employment and created a hostile and abusive work environment.

102.     Mr. Rogers would not have been harassed by his supervisors but for his age.

103.     Defendants knew, or in the exercise of reasonable care, should have known that Mr. Rogers was being harassed based on his age.

104.     Alternatively, Defendants utilized employment practices that are facially neutral in their treatment of employees but, in fact, had a significantly disproportionate adverse impact on persons over 40 years.

105.     Defendant's employment practices resulted in the termination of Mr. Rogers, and many other individuals over 40 years old.

106.     Defendants are vicariously liable for the harassment of Mr. Rogers by his supervisors.

107.     As a direct and proximate result of Defendants' discriminatory conduct, Mr. Rogers has suffered substantial economic and non-economic damages, and he is entitled to such damages, liquidated damages, and attorneys' fees and costs as permitted by law.

108.     Defendants' discriminatory conduct was willful and in knowing and/or reckless disregard of the requirements of the ADEA.

109.     Defendants are liable for the acts and/or omissions of their agents and employees.

110.     Defendants, either directly or by and through their agents, directly and proximately caused Mr. Rogers's severe injuries, damages, and losses.

**SECOND CAUSE OF ACTION**
**Section 504 of the Rehabilitation Act of 1973**
**Discrimination and Failure to Accommodate**
*(Against Defendants Phillips 66 and Phillips 66 Company)*

111.   Mr. Rogers hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

112.   Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*., ("Rehabilitation Act") provides that no "otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. §§ 794(A), (b)(2)(A).

113.   At all times relevant to this Complaint, Phillips 66 and Phillips 66 Company were subject to the requirements of the Rehabilitation Act based on its receipt of Federal financial assistance.

114.   At all times relevant to this Complaint, Mr. Rogers was a disabled individual within the meaning of the Rehabilitation Act, and he was a qualified individual with physical or mental impairments which substantially limit one or more of his major life activities.

115.   At all pertinent times, Mr. Rogers performed the functions of his job competently and was more than qualified.

116.   Mr. Rogers could have continued to perform the essential functions of his position with a reasonable accommodation from Defendants.

117.   Mr. Rogers requested accommodations for his disability including FMLA leave, short screen time breaks, lighting changes, and indoor temperature control, among other requests.

118.   Defendants were aware of Mr. Rogers's disabilities and his requests for accommodations.

119.    Defendants failed to engage in the interactive process and failed to respond to Mr. Rogers's requests for accommodations.

120.    Defendants unjustifiably denied his requests and failed to make reasonable accommodations for Mr. Rogers.

121.    Although Mr. Rogers was qualified for promotions, Defendants promoted non-disabled individuals in place of Mr. Rogers.

122.    Defendants intentionally discriminated against Mr. Rogers because of his disability.

123.    Defendants took several adverse actions against Mr. Rogers including failing to promote him and termination.

124.    The adverse actions taken against Mr. Rogers were motivated by his disabilities.

125.    Mr. Rogers was subjected to severe and pervasive harassment by his supervisors.

126.    This harassment altered the terms and conditions of his employment and created a hostile and abusive work environment.

127.    Mr. Rogers would not have been harassed by his supervisors but for his disabilities.

128.    Defendant knew, or in the exercise of reasonable care, should have known that Mr. Rogers was being harassed based on his disabilities.

129.    As a result of Defendants' failure to make accommodations, and Defendants' termination of Mr. Rogers's employment, Mr. Rogers suffered emotional damages, lost wages, loss of benefits, and other losses, as well as reasonable attorney's fees pursuant.

130.    Defendants are liable for the acts and/or omissions of their agents and employees.

131.    Defendants, either directly or by and through their agents, directly and proximately caused Mr. Rogers's severe injuries, damages, and losses.

20

**THIRD CAUSE OF ACTION**
**Section 504 of the Rehabilitation Act of 1973**
**Retaliation**
*(Against Defendants Phillips 66 and Phillips 66 Company)*

132.     Mr. Rogers hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

133.     As set forth in detail above, Defendants were aware of Mr. Rogers's disabilities and his requests for accommodations. Nonetheless, Defendants refused to engage in the interactive process, and instead, subjected him to a hostile work environment, failed to promote him, and then terminated Mr. Rogers.

134.     Defendants retaliated against Mr. Rogers because of his requests for accommodations when they subjected him to a hostile work environment, failed to promote him, and then terminated Mr. Rogers.

135.     Although Mr. Rogers was qualified to be promoted, he was not, and instead, individuals who had not engaged in protected activity were promoted. Further, Mr. Rogers was replaced by individuals who did not engage in protected activity.

136.     The adverse actions taken against Mr. Rogers were in retaliation for requesting accommodations and were motivated by retaliatory animus.

137.     As a result of Defendants' failure to accommodate Mr. Rogers, failure to promote, hostile work environment, and termination of Mr. Rogers's employment, Mr. Rogers suffered emotional damages, lost wages, loss of benefits, and other losses.

138.     Defendants are liable for the acts and/or omissions of their agents and employees.

139.     Defendants, either directly or by and through their agents, directly and proximately caused Mr. Rogers's severe injuries, damages, and losses.

**FOURTH CAUSE OF ACTION**
**Title I of the Americans with Disabilities Act**
**Discrimination**
*(Against Defendants Phillips 66 and Phillips 66 Company)*

140.    Mr. Rogers hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

141.    Title I of the Americans with Disabilities Act (ADA) prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

142.    Defendants Phillips 66 and Phillips 66 Company are covered employers under the ADA. *See* 42 U.S.C. § 12111(5).

143.    Mr. Rogers is a "qualified individual with a disability" as defined by the ADA, 42 U.S.C. § 12111, as he had physical or mental impairments which substantially limit one or more of his major life activities.

144.    At all pertinent times, Mr. Rogers performed the functions of his job competently and was more than qualified.

145.    Mr. Rogers could have continued to perform the essential functions of his position with reasonable accommodation from his employer.

146.    Mr. Rogers requested accommodations for his disability including FMLA leave, short screen time breaks, lighting changes, and indoor temperature control, among other requests.

147.    Defendants were aware of Mr. Rogers's disabilities and his requests for accommodations.

148.    Defendants failed to engage in the interactive process and failed to respond to Mr. Rogers's requests for accommodations.

149.    Defendants unjustifiably denied his requests and failed to make reasonable accommodations for Mr. Rogers.

150.    Although Mr. Rogers was qualified for promotions, Defendants promoted younger individuals in place of Mr. Rogers.

151.    Defendants intentionally discriminated against Mr. Rogers because of his disability.

152.    Defendants took several adverse actions against Mr. Rogers including failing to promote him and termination.

153.    The adverse actions taken against Mr. Rogers were motivated by his disabilities.

154.    Mr. Rogers was subjected to severe and pervasive harassment by his supervisors.

155.    This harassment altered the terms and conditions of his employment and created a hostile and abusive work environment.

156.    Mr. Rogers would not have been harassed by his supervisors because of his disabilities.

157.    Mr. Rogers knew, or in the exercise of reasonable care, should have known that Mr. Rogers was being harassed based on his disabilities.

158.    As a result of Defendants' failure to make accommodations, and Defendants' termination of Mr. Rogers's employment, Mr. Rogers suffered emotional damages, lost wages, loss of benefits, and other losses, as well as reasonable attorney's fees pursuant.

159.    Defendants are liable for the acts and/or omissions of their agents and employees.

160.     Defendants, either directly or by and through their agents, directly and proximately caused Mr. Rogers's severe injuries, damages, and losses.

**FIFTH CAUSE OF ACTION**
**Title I and Title V of the Americans with Disabilities Act**
**Retaliation**
*(Against Defendants Phillips 66 and Phillips 66 Company)*

161.     Mr. Rogers hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

162.     Title V of the ADA further provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a).

163.     As set forth in detail above, Defendants were aware of Mr. Rogers's disabilities and his requests for accommodations. Nonetheless, Defendants refused to engage in the interactive process, and instead, subjected him to a hostile work environment, failed to promote him, and then terminated Mr. Rogers.

164.     Defendants retaliated against Mr. Rogers because of his requests for accommodations when they subjected him to a hostile work environment, failed to promote him, and then terminated Mr. Rogers.

165.     The adverse actions taken against Mr. Rogers were in retaliation for requesting accommodations and were motivated by retaliatory animus.

166.     Although Mr. Rogers was qualified to be promoted, he was not, and instead, individuals who had not engaged in protected activity were promoted. Further, Mr. Rogers was replaced by individuals who did not engage in protected activity.

167.     As a result of Defendants' retaliation against Mr. Rogers, failure to promote, hostile work environment, and termination of Mr. Rogers's employment, Mr. Rogers suffered emotional damages, lost wages, loss of benefits, and other losses.

168.     Defendants are liable for the acts and/or omissions of their agents and employees.

169.     Defendants, either directly or by and through their agents, directly and proximately caused Mr. Rogers's severe injuries, damages, and losses.

**SIXTH CAUSE OF ACTION**
**Family Medical Leave Act, 29 U.S.C. § 2601 *Et Seq*.**
**Interference, Denial, and Retaliation**
***(Against all Defendants)***

170.     Mr. Rogers hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

171.     Mr. Rogers was an eligible employee as defined by the FMLA at all relevant times to this Complaint and was "entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

172.     Defendants were Mr. Rogers's "employers" within the meaning of the Family Medical Leave Act ("FMLA") as they had over fifty employees within 75 miles. See 29 U.S.C. § 2611(4).

173.     Accordingly, Mr. Rogers was protected by the FMLA, including the provisions prohibiting interference with and retaliation for the exercise of his rights under the FMLA.

174.     Defendant Janson acted, directly or indirectly, in the interest of Phillips 66 and Phillips 66 Company when interacting with Mr. Rogers and exercised independent control over Mr. Rogers's work situation.

175.     The FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title … [or] to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title." 29 U.S.C. § 2615.

176.     The FMLA further provides: "When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(B)(1). An employer's failure to provide notice as required constitutes "interference with, restraint, or denial of the exercise of an employee's FMLA rights." 29 C.F.R. § 825.300(E).

177.     Although Mr. Rogers repeatedly requested FMLA to receive treatment for his disabilities, for over a year he received no response, and then, ultimately his request was denied.

178.     Defendants did not have a good faith belief or reasonable grounds for violating Mr. Rogers's rights under the FMLA.

179.     Defendants retaliated against Mr. Rogers for requesting FMLA leave when they subjected him to a hostile work environment, refused to promote him, and ultimately terminated his employment for requesting FMLA leave.

180.     Although Mr. Rogers was qualified to be promoted, he was not, and instead, individuals who had not engaged in protected activity were promoted. Further, Mr. Rogers was replaced by individuals who did not engage in protected activity.

181.     As a result of Defendants' unlawful conduct, Mr. Rogers sustained lost wages, lost benefits, and is entitled to liquidated damages. Defendants did not act in good faith in violating the FMLA.

182.    Defendants are liable for the acts and/or omissions of their agents and employees.

183.    Defendants, either directly or by and through their agents, directly and proximately

caused Mr. Rogers's severe injuries, damages, and losses.

**SEVENTH CAUSE OF ACTION**
**Disability Discrimination in Violation of the**
**Louisiana Employment Discrimination Law**
*(Against Defendants Phillips 66 and Phillips 66 Company)*

184.    Mr. Rogers hereby incorporates all preceding paragraphs of this Complaint as

though fully set forth herein.

185.    The Louisiana Employment Discrimination Law ("LEDL") provides that "[n]o

otherwise qualified person with a disability shall, on the basis of a disability, be subjected to

discrimination in employment." La. R.S. § 23:323(A).

186.    LEDL specifically prohibits employers from "discharg[ing] or otherwise

discriminat[ing] against an otherwise qualified person with a disability with respect to

compensation or the terms, conditions, or privileges of employment on the basis of a disability

when it is unrelated to the individual's ability to perform the duties of a particular job or position."

La. R.S. § 23:323(B)(2).

187.    At all relevant times, Mr. Rogers's disabilities described in detail above constituted

"physical or mental impairments which substantially limit one or more of her major life activities"

as defined by LEDL.

188.    At all pertinent times, Mr. Rogers performed the duties of his job competently and

was more than qualified.

189.    At all times relevant to this action, Defendants Phillips 66 and Phillips 66 Company

were "employers" as that term is defined by LEDL, and Mr. Rogers was an "otherwise qualified

employee with a disability" entitled to protection in her employment from discrimination based on her disabilities within the meaning of LEDL.

190.    As described above, Mr. Rogers was subjected to many adverse employment actions because of his disabilities, including but not limited to, subjecting him to a hostile work environment, failing to promote him, and terminating him from his employment.

191.    Although Mr. Rogers was qualified for promotions, Defendants promoted non-disabled individuals in place of Mr. Rogers.

192.    Defendants intentionally discriminated against Mr. Rogers because of his disabilities.

193.    Mr. Rogers was terminated from his employment for no legitimate, non-discriminatory reason, as alleged above, and if not for Mr. Rogers's disabilities, he would not have been subject to discrimination by Defendants.

194.    Defendants knew or should have known of the unlawful acts and practices alleged above yet failed to act promptly to prevent or end the harassment and discrimination.

195.    Defendants are liable for the acts and/or omissions of their agents and employees.

196.    Defendants, either directly or by and through their agents, directly and proximately caused Mr. Rogers's severe injuries, damages, and losses.

197.    As a result of Defendants' misconduct, Mr. Rogers has suffered and continues to suffer damages, including but not limited to lost wages and emotional damages, and is thus entitled to all damages and remedies available under LEDL pursuant to La. R.S. § 23:303.

198.    Defendants' unlawful and discriminatory conduct in violation of La. R.S. 23:332(A)(1) was outrageous and malicious, was intended to injure Mr. Rogers, and was done

with conscious disregard of Mr. Rogers's civil rights, entitling Mr. Rogers to an award of attorneys' fees under La. R.S. § 23:303.

### EIGHTH CAUSE OF ACTION
**Age Discrimination and Retaliation in Violation of the
Louisiana Employment Discrimination Law**
*(Against Defendants Phillips 66 and Phillips 66 Company)*

199.    Mr. Rogers hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

200.    The Louisiana Employment Discrimination Law ("LEDL") provides that "[i]t is unlawful for an employer to . . . [f]ail or refuse to hire, or to discharge, any individual or otherwise discriminate against any individual with respect to his compensation, or his terms, conditions, or privileges of employment because of the individual's age." La. R.S. § 23:312(A).

201.    LEDL further prohibits employers from retaliating against any employee who "has opposed any practice made unlawful" under LEDL's prohibition on employment practices that discriminate against individuals who are 40 years of age or older. La. R.S. § 23:312(D).

202.    At all pertinent times, Mr. Rogers performed the duties of his job competently and was more than qualified.

203.    At all times relevant to this action, Defendants Phillips 66 and Phillips 66 Company were "employers" as that term is defined by LEDL, and Mr. Rogers was a qualified employee who was over 40 years old.

204.    As described above, Mr. Rogers was subjected to many adverse employment actions as a result of his age, including but not limited to, subjecting him to a hostile work environment, failing to promote him, and terminating him from his employment.

205.    Although Mr. Rogers was qualified for promotions, Defendants promoted younger individuals in place of Mr. Rogers.

206.    Defendants intentionally discriminated against Mr. Rogers because of his age.

207.    As described above, Mr. Rogers complained to his supervisors that he was being treated less favorably than his younger, less-qualified co-workers. Mr. Rogers further stated that he intended to file a report with Defendants' corporate headquarters regarding the discriminatory treatment he and other employees over the age of 40 were being subjected to at the Alliance Refinery.

208.    Defendants retaliated against Mr. Rogers for engaging in activity protected under La. R.D. 23:312(D) by targeting him with unwarranted discipline, subjecting him to a hostile work environment, refusing to promote him, and ultimately terminating his employment.

209.    Mr. Rogers was terminated from his employment for no legitimate, non-discriminatory reason, as alleged above, and if not for Mr. Rogers's age and complaints of discrimination, he would not have been subject to discrimination by Defendants.

210.    Defendants knew or should have known of the unlawful acts and practices alleged above yet failed to act promptly to prevent or end the harassment and discrimination.

211.    Defendants are liable for the acts and/or omissions of their agents and employees.

212.    Defendants, either directly or by and through their agents, directly and proximately caused Mr. Rogers's severe injuries, damages, and losses.

213.    As a result of Defendants' misconduct, Mr. Rogers has suffered and continues to suffer damages, including but not limited to lost wages and emotional damages, and is thus entitled to all damages and remedies available under LEDL pursuant to La. R.S. § 23:303.

214.    Defendants' unlawful and discriminatory conduct in violation of La. R.S. 23:332(A)(1) was outrageous and malicious, was intended to injure Mr. Rogers, and was done

30

with conscious disregard of Mr. Rogers's civil rights, entitling Mr. Rogers to an award of attorneys' fees under La. R.S. § 23:303.

### NINTH CAUSE OF ACTION
### Discrimination and Retaliation in Violation of the
### Louisiana Human Rights Act
### *(Against all Defendants)*

215.    Mr. Rogers hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

216.    The Louisiana Human Rights Act ("LHRA") is intended to "safeguard all individuals within the state from discrimination because of . . . age, [and] disability . . . in connection with employment . . . ; to protect their interest in personal dignity and freedom from humiliation; to make available to the state their full productive capacities in employment . . . ; and to further the interest, rights, and privileges within the state." La. R.S. § 51:2231.

217.    The LHRA makes it unlawful for an employer, as defined by LEDL, "[t]o retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this Chapter or by [LEDL]," La. R.S. § 51:2256, and provides civil remedies for "any person deeming himself injured by" such unlawful conduct. La. R.S. § 51:2264.

218.    At all times relevant to this action, the LHRA has been in full force and effect and has applied to Defendants' conduct.

219.    As set forth above, Defendants discriminated against Mr. Rogers on the basis of his age and disabilities in connection with his employment, as prohibited by the LHRA.

220.    Defendants retaliated against Mr. Rogers because of his requests for accommodations, subjected him to a hostile work environment, refused to grant his accommodation requests, failed to promote him, and terminated his employment.

31

221.    Defendant engaged in conduct materially adverse to a reasonable employee and took adverse employment actions against Mr. Rogers, as heretofore alleged.

222.    The adverse actions taken against Mr. Rogers were in retaliation for requesting accommodations and were motivated by retaliatory animus.

223.    Although Mr. Rogers was qualified to be promoted, he was not, and instead, individuals who had not engaged in protected activity were promoted. Further, Mr. Rogers was replaced by individuals who did not engage in protected activity.

224.    Defendants are liable for the acts and/or omissions of their agents and employees.

225.    Defendants, either directly or by and through their agents, directly and proximately caused Mr. Rogers's severe injuries, damages, and losses.

226.    As a result of Defendants' retaliation, Mr. Rogers has suffered and continues to suffer damages, including but not limited to lost wages and emotional damages, and is thus entitled to all damages and remedies available under LEDL and the LHRA.

227.    Defendants' unlawful and retaliatory conduct in violation of La. R.S. 23:332(A)(2) was outrageous and malicious, was intended to injure Mr. Rogers, and was done in conscious disregard of Mr. Rogers's civil rights, entitling Mr. Rogers to an award of attorneys' fees under La. R.S. 23:3030.

## VII.    RELIEF REQUESTED

WHEREFORE, Plaintiff requests judgment be entered against Defendants and that the Court grant the following:

   a.   Declaratory relief;

   b.   Injunctive relief including but not limited to reinstatement;

   c.   Judgment against Defendants for Plaintiffs' asserted causes of action;

d.  Damages in such an amount as shall be proven at trial for back-pay and damages including lost benefits, wages, promotions, tenure, seniority, lost promotions, and other employment opportunities;

e.  Award of compensatory damages including for emotional distress;

f.  An order for the Defendant to reinstate Plaintiff or in the alternative to pay for front-pay and benefits;

g.  Punitive damages;

h.  Award of treble damages;

i.  Award of liquidated damages;

j.  Award costs and attorney's fees;

k.  Pre- and post-judgment interest; and

l.  Order such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

/s/      Casey Denson
**Casey Rose Denson (La. Bar #33363)**
**Justine G. Daniel (La. Bar #36856)**
**CASEY DENSON LAW, LLC**
4601 Dryades Street
New Orleans, LA 70115
Phone: (504) 224-0110
Fax: (504) 534-3380
cdenson@caseydensonlaw.com
 jdaniel@caseydensonlaw.com
*Attorneys for Plaintiff Andrew Rogers*